**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

PENSION BENEFIT GUARANTY   )
 CORPORATION,   )
1200 K Street, N.W.   )
Washington, D.C. 20005-4026   )
   )
 Plaintiff,   )
   )
   v.   )   Civil Action No.
   )
UNION STEEL PRODUCTS, INC.,   )
509 North Albion Street   )
Albion, Michigan 49224   )
   )
   and   )
   )
DONALD CARSTENS,   )
7095 Eagle Heights Drive   )
Mattawan, Michigan 49071   )
   )
   and   )
   )
INDIANA WIRE COMPANY   )
5550 North 375 East   )
Fremont, Indiana 46737   )
   )
   and   )
   )
M&D LEASING CORPORATION,   )
7095 Eagle Heights Drive   )
Mattawan, Michigan 49071   )
   )
 Defendants. _____ )

## COMPLAINT

**Jurisdiction and Venue**

1. This action seeks recovery of pension liabilities under Title IV of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§§ 1301-1461 (1994 and Supp. V 1999). The Pension Benefit Guaranty Corporation ("PBGC") brings this action pursuant to 29 U.S.C. §§ 1303(e), 1342(d)(2)(B)(ii), and 1342(d)(2)(B)(iv), in its capacity as statutory guarantor and in its capacity as statutory trustee of the Union Steel Products, Inc. Union Employees Pension Plan (the "Pension Plan"), to collect unfunded benefit liabilities and delinquent ERISA-mandated contributions under 29 U.S.C. §§ 1362 and 1369.

2. Under 29 U.S.C. §§ 1301 and 1362, a company that sponsors a pension plan and all trades or businesses under "common control" with the sponsor are jointly and severally liable for unfunded benefit liabilities. In this case, on the eve of the liquidation of the plan sponsor, the business owner transferred — for no consideration — a minority interest in the plan sponsor. The owner asserts that this transfer eliminated the "common control," and if so, the owner's other businesses would escape liability. However, PBGC asserts in this lawsuit that (1) the purported stock transfer is disregarded because it was a sham transaction with no or negligible economic consequence other than avoidance of Title IV liability, and (2) a principal purpose of the transaction was to evade Title IV liability, and therefore liability is imposed under 29 U.S.C. § 1369.

3. This Court has jurisdiction over this action without regard to the amount in controversy pursuant to 29 U.S.C. § 1303(e)(3).

4. Venue properly lies within this district based on 29 U.S.C. § 1303(e)(2).

5. Plaintiff PBGC is a United States government agency established under 29 U.S.C. § 1302 to administer the pension plan termination insurance program created by Title IV of ERISA.

6. Defendant Union Steel Products, Inc. is or was a corporation organized under the laws of Michigan, with its principal place of business located in Albion, Michigan

7. Defendant Donald D. Carstens ("Carstens") is a resident of Mattawan, Michigan.

8. Defendant Indiana Wire Company ("Indiana Wire") is a corporation organized under the laws of Indiana, with its principal place of business located in Fremont, Indiana.

9. Defendant M&D Leasing Corporation ("M&D Leasing") is a corporation organized under the laws of Michigan, with its principal place of business located in Mattawan, Michigan.

**Factual Allegations**

10. Union Steel Products was a light-steel manufacturing company almost 100 years old. Effective January 1, 1971, Union Steel Products established the Pension Plan for the benefit of its hourly employees.

11. The Pension Plan is covered by Title IV of ERISA.

12. In 1989 Carstens, through two shell corporations that he created and owned — DCMC, Inc, and M&D Leasing, Inc. — acquired most of the assets of Union Steel Products in a leveraged buyout. Carstens personally paid $50,000 for the acquisition, and personally guaranteed acquisition loans of more than $3 million for up to $500,000. Immediately after the acquisition, DCMC, Inc. was renamed Union Steel Products, Inc. ("USP").

13. M&D Leasing received title to USP's real property — its manufacturing plants — and then rented it back to USP.

14. As part of the acquisition, USP expressly assumed the liabilities of the Pension Plan.

15. When Carstens acquired USP in 1989, he already owned 51% of United Steel and Wire, Inc. a light-steel manufacturing company located in Battle Creek Michigan that Carstens had acquired via leveraged buyout in 1982. United Steel manufactured some of the same or similar products as USP, such as grocery carts.

16. Approximately two months after acquiring USP, Carstens created another shell corporation that in 1991 he renamed Indiana Wire Company.

17. USP was profitable from 1989 through 1991.

18. During the period 1992-1995, Indiana Wire commenced — and USP gradually ceased — production of wire-mesh decks for warehouse storage systems, called rack-decking. In the early to mid-1990's, rack-decking comprised approximately 40% of USP's sales and was its fastest-growing product line.

19. During the period 1989-1995, USP transferred assets to and provided services for Indiana Wire, United Steel, and other companies in which Carstens had an interest.

20. During the period 1989-1995, Carstens personally rented substantial property to USP, Indiana Wire, and United Steel, as well as to other companies in which he had an interest. During that period, he also obtained substantial income from consulting services that he provided to some of his companies.

21. From 1992 to 1995, USP was increasingly unprofitable.

22. USP hourly production employees were represented by Local Union No. 164 of the International Brotherhood of Teamsters (the "Union"). By letter dated April 7, 1995, USP notified the Union that USP intended to cancel the collective

bargaining agreement upon its expiration on June 30, 1995, and stated that USP's future was very much in doubt.

23. On April 25, 1995, USP sent its employees a notice under the Worker Adjustment and Retraining Notification ("WARN") Act that its plants would be permanently closing.

24. On June 13, 1995, the Union rejected USP's proposal — purportedly made to enable USP to continue a segment of the business — for changes in work rules and drastic reductions in wages and benefits.

25. As of June 1995, USP:

    (a) was losing more than $100,000 a month;

    (b) was in technical default to the National Bank of Detroit, its secured lender, on loans of over $2 million;

    (c) was a defendant in numerous suits by suppliers who USP had not paid;

    (d) could not fill orders and had lost customers because its suppliers would no longer extend credit;

    (e) had a negative net worth; and

    (f) owed its trade and governmental creditors more than $1.5 million.

26. Under Title IV of ERISA, PBGC guarantees certain benefits in covered pension plans that terminate with insufficient assets to pay those benefits. In turn, the plan sponsor and all trades or businesses — whether or not incorporated — under "common control" with the plan sponsor are liable to PBGC for unfunded benefit liabilities. "Common control" exists when the same five or fewer persons own at least 80% of two or more "trades or businesses."

27. On June 15, 1995, Carstens owned 100% of USP, Indiana Wire, M&D Leasing, and his rental and consulting proprietorships. Each was a "trade or business" under Carstens's "common control."

28. As of June 1995, USP and its controlled group members were delinquent on payment of ERISA-mandated contributions to the Pension Plan, which was underfunded by millions of dollars.

29. On June 16, 1995, or later, Carstens purported to transfer — for no consideration — 30% of his ownership interest in USP to two USP officers. Falsified minutes of a corporate meeting that allegedly occurred on June 16, 1995, state that the reason for this transfer was to provide an incentive for the officers' performance of their duties in order to improve the company's operations. Carstens has since ratified or confirmed this alleged rationale.

30. On June 16, 1995, there was no realistic chance that USP would continue operations and return to sufficient profitability to fund the Pension Plan.

31. On June 16, 1995, the 30% minority stock that Carstens purported to transfer was worthless.

32. On July 1, 1995, USP locked out its hourly employees. Replacement workers were hired to close out existing orders and otherwise complete the liquidation of the company.

33. In connection with the closing of USP's plants, Indiana Wire and United Steel obtained certain USP equipment and materials. USP advised its customers that certain USP product lines could henceforth be purchased from Indiana Wire and certain other product lines could be purchased from United Steel.

34. On December 31, 1995, Carstens formally declared that the USP plants were permanently closed, and thereafter USP's remaining assets were liquidated, in part via foreclosure sale by the National Bank of Detroit.

35. Following PBGC's Notice of Determination on July 29, 1999, the Pension Plan was terminated pursuant to 29 U.S.C. § 1348 as of December 31, 1995 (the "Date of Termination"), and PBGC was appointed statutory trustee pursuant to 29 U.S.C. § 1342(c).

36. As of the Date of Termination, the Pension Plan had unfunded benefit liabilities of $4,846,765. Interest owed on that underfunding as of December 31, 2001, will be $3,162,681.

37. As of the Date of Termination, Carstens owned 100% of Indiana Wire, M&D Leasing, and his rental and consulting proprietorships, each of which was a "trade or business" within the meaning of 29 U.S.C. § 1301.

38. Under 29 U.S.C. § 1343 and the regulations thereunder, the Plan Administrator — whose functions were performed by Carstens — was required to notify PBGC within 30 days of a failure to make ERISA-mandated contributions to the Pension Plan.

39. Notwithstanding the failure of USP and other controlled group members to make contributions to the Pension Plan during 1994 and 1995, the Plan administrator failed to notify PBGC of delinquent contributions until February 1996.

40. Under 29 U.S.C. § 1343 and the regulations thereunder, the Pension Plan Administrator — whose functions were performed by Carstens — was required to notify PBGC within 30 days of any change in the membership of the controlled group.

41. Notwithstanding the June 16, 1995, purported transfer by Carstens of 30% of his USP stock, the Plan administrator failed to notify PBGC of the stock transfer until June 14, 1999.

## COUNT ONE

### Sham Transaction / Section 1362 Liability

42. Carstens's purported transfer of 30% of his USP stock had no real economic or business consequence other than avoidance of Title IV liability to PBGC under 29 U.S.C. § 1362.

43. Even if Carstens's purported transfer of 30% of his USP stock had some real economic or business consequence other than avoidance of Title IV liability, that purpose was negligible in light of the amount of pension liabilities that were putatively avoided.

44. Carstens's purported transfer of 30% of his USP stock was a sham. Under the "form over substance" doctrine, because nothing substantial was transferred, the transaction is treated as nothing — disregarded — for ERISA purposes. When the purported transfer is disregarded, Carstens is deemed to have owned 100% of USP as of the Date of Termination.

45. USP and the other controlled group members — Indiana Wire, M&D Leasing, and Carstens as sole proprietor of his rental and consulting businesses — are jointly and severally liable to PBGC under 29 U.S.C. § 1362 for the Pension Plan's unfunded benefit liabilities in the amount of $4,846,765, and unpaid ERISA-

mandated contributions in the amount of $783,149, plus interest on both from December 31, 1995, at the rate specified under 26 U.S.C. 6621.

## COUNT TWO

### Section 1369 Evasion Liability

46. Under 29 U.S.C. § 1369, if any person enters into a transaction within five years prior to the date of pension plan termination with a principal purpose of evading liability under 29 U.S.C. § 1362, then such person and the members of that person's controlled group are subject to liability as if the person were a contributing sponsor of the terminated plan as of the date of termination.

47. A principal purpose of Carstens's purported transfer of 30% of his USP stock was to evade liability under Title IV with respect to the underfunding of the Pension Plan.

48. Therefore, under 29 U.S.C. § 1369, USP and the other controlled group members — Indiana Wire, M&D Leasing, and Carstens as sole proprietor of his rental and consulting businesses — are jointly and severally liable to PBGC for the Pension Plan's unfunded benefit liabilities in the amount of $4,846,765, and unpaid ERISA-mandated contributions in the amount of $783,149, plus interest on both from December 31, 1995, at the rate specified under 26 U.S.C. 6621.

## DEMAND

WHEREFORE, plaintiff Pension Benefit Guaranty Corporation demands:

(1) Judgment in its favor, against each defendant, jointly and severally, pursuant to 29 U.S.C. §§ 1362(b) and 1369, in the amount of $4,846,765, plus interest at the rate specified in 26 U.S.C. § 6621, commencing on December 31, 1995, and continuing through the date of payment; and

(2) Judgment in its favor, on behalf of the Union Steel Products, Inc. Union Employees Pension Plan, against each defendant, jointly and severally, pursuant to 29 U.S.C. §§ 1362(c) and 1369, in the amount of $783,149, plus interest at the rate specified in 26 U.S.C. § 6621, commencing on December 31, 1995, and continuing through the date of payment; and

(3) An award of costs of litigation, pursuant to 29 U.S.C. § 1303(e)(5); and

(4) Such further relief as may be just.

                                      Respectfully submitted,

Local Counsel of Record:

_____

| MARGARET M. CHIARA | JAMES J. KEIGHTLEY |
|---|---|
| United States Attorney | General Counsel |
| | JEFFREY B. COHEN |
| | Deputy General Counsel |
| | DEBORAH WEST |
| | Senior Assistant General Counsel |
| | BERNARD P. KLEIN |
| | Attorney |
| | MARK BLANK |
| RONALD M. STELLA | Attorney |
| Assistant United States Attorney | CYNTHIA GREENE |
| 330 Ionia Avenue, N.W. | Attorney |
| P.O. Box 208 | |
| Grand Rapids, Michigan 49501-0208 | |
| (616) 456-2404 | |
| | Attorneys for Plaintiff |
| | PENSION BENEFIT GUARANTY |
| | CORPORATION |
| | Office of the General Counsel |
| | 1200 K Street, N.W. |
| | Washington, D.C. 20005-4026 |
| Dated: _____ | (202) 326-4020 Ext. 3879 |